# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION

| | |
|---|---|
| THOMAS OBROCK, | ) |
| | ) |
|     Plaintiff, | ) |
| | ) No. 3:15-cv-00279 |
| v. | ) |
| | ) Judge Sharp |
| INTERNATIONAL AUTOMOTIVE | ) Magistrate Judge Holmes |
| COMPONENTS, LLC, | ) |
| | ) |
|     Defendant. | ) |

## MEMORANDUM

Presently pending before the Court is Defendant International Automotive Components, LLC's Motion for Summary Judgment. (Docket No. 23). Plaintiff Thomas Obrock has filed a Response in Opposition, (Docket No. 37), to which Defendant has replied, (Docket No. 39). For the reasons set forth below, Defendant's Motion will be granted and this case will be dismissed.

## I. Factual & Procedural Background

Unless stated otherwise, the following facts are drawn from Defendant's Concise Statement of Facts, (Docket No. 24), and Plaintiff's response thereto, (Docket No. 38). As a threshold matter, the record provides very little information regarding the nature of Defendant International Automotive Components' ("IAC" or "the Company") work, which makes it a bit difficult to understand the facts and policies surrounding Plaintiff's termination. From an Internet search, the Court has determined that Defendant "designs, engineers, manufactures, and distributes automotive components and systems."[1] These systems and components include "cockpit instrument panel accessories, floor consoles, door panels, overhead systems, flooring and acoustics, hard trims, blow-molded load floors, and exterior trims; and blow-molded

---

[1] *Company Overview of International Automotive Components Group North America, Inc.*, BLOOMBERG, http://www.bloomberg.com/research/stocks/private/snapshot.asp?privcapId=37542139 (last visited July 14, 2016).

1

products, such as fluid recovery bottles or washer fluid bottles to HVAC ducts, load floors, seat backs, and floor consoles." Id. Plaintiff worked as a facility engineer in one of Defendant's manufacturing plants. Plaintiff began working for a predecessor company, Collins & Aikman, in August 2007 at its Springfield, Tennessee location. Within a month of Plaintiff's arrival at Collins & Aikman, Defendant acquired the Springfield plant and Plaintiff continued his employment in the same location but as an employee of IAC.

Federal law regulates Defendant's safety procedures and requires Defendant to have and enforce a lockout/tagout policy ("LOTO policy"). The LOTO policy is designed to prevent "serious harm to employees from the unexpected release of energy during repair, maintenance, set-up, or start-up of equipment." (Docket Nos. 24 & 38 at ¶ 3). Lockout/Tagout is defined as "the placement of a lock/tag on an energy isolating device, in accordance with an established procedure, to ensure that the energy isolating device and the equipment being controlled [by the isolating device] cannot be operated until the lock and tag is removed." (Docket No. 31-3 at 10) (LOTO policy Power Point presentation). Thus, the LOTO policy ensures that machinery will not be used when excess energy poses a risk. In addition to the use of a lock or a tag, machinery may be de-energized using "alternative measures," such as unplugging the machine or flipping safety switches. (Docket Nos. 24 & 38 at ¶ 9).

Failing to abide by the LOTO policy can have serious consequences, including injury or death. Under IAC's policy, those employees who work in a plant area that entails exposure to hazardous energy, Plaintiff included, are designated as authorized employees. Authorized employees "must following individual lockout procedures in order to operate, use, service, maintain, or set up equipment." (Docket Nos. 24 & 38 at ¶ 7). The LOTO policy is zero-tolerance and specifically provides that employees who do not comply with it may be subject to

termination.  Plaintiff was well-versed in the LOTO policy.  He underwent LOTO training in 2011 and 2012 and even helped revise the policy in 2012.  His training involved an assessment, one portion of which required Plaintiff to acknowledge that failure to follow the LOTO policy "would result in disciplinary action up to and including termination."  (Id. at ¶ 12).

In 2014 IAC launched a new product line, which required the Company to "transition its equipment."  (Id. at ¶ 14).  Plaintiff was tasked with assisting the transition of the T532, a piece of machinery necessary to the launch of the new product line.  On Saturday, April 26th, 2014, Plaintiff "assisted a crew struggling to adjust clamps on the T532."  (Id. at ¶ 17).  Plaintiff adjusted the clamps without locking out the machine.  According to Plaintiff, he did not begin the adjustment until after enabling three safety switches.  Regardless of the use of any safety switches, it is undisputed that Plaintiff never disconnected the machine from its power supply.  Neither was the machine locked out or otherwise de-energized.  A maintenance manager, Mike Jeffcoat, observed Plaintiff making the adjustments to the T532 without first de-energizing it in violation of the LOTO policy.  Plaintiff does not dispute that Mr. Jeffcoat asked him to stop his adjustments and lock out the machine four times but that Plaintiff did not stop.  An Operations Manager, Dave Nichols, also witnessed Plaintiff violating the LOTO policy and directed him to stop working and lock out the machine.  Plaintiff did not know who Mr. Nichols was, but does not dispute ignoring his directions.  Eventually, Plaintiff abated his adjustments and left the area without finishing the job.

Mr. Jeffcoat contacted Plaintiff's supervisor, Brian Thomas, to report Plaintiff's violation of the LOTO policy.  On Monday, April 28th, Defendant placed Plaintiff on an indefinite suspension pending an investigation into the April 26th violation.  The Springfield management team held a conference call that day.  The call involved Mr. Thomas, Mr. Jeffcoat, Human

Resources Manager Ken Williams, Acting Plant Manager Lonnie Holmquist, as well as the corporate safety director, the vice president of operations, and the human resources director, whose names are not included in the record. Those on the call reviewed the infraction and determined that Plaintiff's LOTO policy violation warranted termination. The Company attempted to contact Plaintiff by telephone for three or four days to inform him of the decision, but did not reach him. It is not clear from the record when Defendant ultimately connected with Plaintiff to inform him of the termination decision, but it appears it was communicated to him at some point in late April or early May 2014.

On a parallel timeline to his termination, Plaintiff was communicating with Mr. Thomas regarding a neck injury. Plaintiff suffered an off-the-job injury in a car accident in 2013. Although the injury required Plaintiff to seek medical care for many months thereafter, neither party has indicated that the accident affected his work. Mr. Thomas did acknowledge, however, that some days he could tell Plaintiff was in pain. (Docket No. 26 at 13:20-14:4) (Deposition of Brian Thomas). On April 25th, the day before the LOTO violation, Plaintiff emailed Mr. Thomas to let him know that he would be meeting with his doctors on May 15th, at which point they would schedule a surgery on his spine. His email does not ask for leave but does note that the surgery would be difficult and that he would risk losing his voice for ten to thirteen weeks. Although Plaintiff did not respond to Defendant's efforts to reach him by phone to discuss his termination, Plaintiff did reach out to Mr. Thomas and Mr. Williams during his suspension to again discuss his need for surgery. In an email on April 29th, one day after the termination decision had been made but before it was communicated, Plaintiff said that he was requesting FMLA leave for the surgery. He did not specify the dates or the amount of leave needed but indicated that he would do so in the future. On April 30th, Plaintiff sent Mr. Thomas and Mr.

4

Williams another email in which he reiterated his request for FMLA leave and asking to know his options. Although it is not included in the record, Plaintiff appears to have included an attachment containing information on his suspension to his April 30th email.

Plaintiff alleges that his termination arose not from the LOTO violation but from his neck injury and his request for FMLA leave. He exhausted his administrative remedies by filing a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") and subsequently filed this suit. He brings claims under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq.*, and the Tennessee Disability Act, Tenn. Code Ann. § 8-50-103. Defendant seeks summary judgment on all claims.

## II.     **Whether Plaintiff Named the Right Defendant**

Before asking the Court to grant summary judgment, Defendant includes a paragraph asserting that Plaintiff's Complaint must be dismissed because he worked for IAC *Springfield*, LLC, not IAC. According to Defendant, no employment relationship existed and thus the Company is not the proper recipient of Plaintiff's termination claims. In contesting suit, Defendant neither clarifies the relationship between itself and IAC Springfield nor provides any compelling authority to shield itself from Plaintiff's claims. This paragraph contains only two citations, both of which are to inapposite cases. Defendant does not even cite to the Federal Rules of Civil Procedure to explain under what provision the Company seeks dismissal. A reference to IAC's website again sheds some light on the matter: IAC expressly lists Plaintiff's former place of employment in Springfield, Tennessee as a "North American Location" of IAC.[2] Moreover, Defendant has been able to fully litigate this case, indicating that the Company is, in

---

[2] North American Locations, IAC GROUP, http://www.iacgroup.com/about-iac/locations/north-america-locations/ (last visited July 12, 2016).

5

fact, the proper party. The Court therefore sees no reason to dismiss the claims against IAC based on a supposed lack of employment relationship between the parties. Because the Court finds that Defendant is nevertheless entitled to summary judgment, this conclusion has little practical effect.

## III. Summary Judgment Standard

Summary judgment is appropriate if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). At the summary judgment stage, we consider the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. See Chapman v. UAW Local 1005, 670 F.3d 677, 680 (6th Cir. 2012) (en banc). However, the non-moving party "must present affirmative evidence in order to defeat a properly supported motion for summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257 (1986). Therefore, summary judgment is proper where the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Van Gorder v. Grand Trunk W. R.R., 509 F.3d 265, 268 (6th Cir. 2007) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)).

## IV. Legal Analysis

### A. Plaintiff's ADA and TDA Claims

Title I of the ADA provides that a covered employer "shall [not] discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." Whitfield, v. Tennessee, 639 F.3d 253, 258 (6th Cir. 2011) (citing 42 U.S.C. § 12112(a)). The TDA prohibits "discrimination in the hiring, firing and

other terms and conditions of employment" of employees "based solely upon any physical, mental or visual disability of the applicant." Tenn. Code Ann. § 8-50-103. The same general elements apply whether the claim is under the ADA or the TDA. Esberger v. Williamson Cty. Gov't, No. 3:13-CV-0744, 2015 WL 3929689, at *4 (M.D. Tenn. June 2, 2015).

To recover on a claim for discrimination under the ADA, a plaintiff must show that he or she (1) is disabled, (2) otherwise qualified to perform the essential functions of the position, with or without accommodation, and (3) suffered an adverse employment action because of his or her disability. See Monette v. Elec. Data Sys. Corp., 90 F.3d 1173, 1178 (6th Cir. 1996); Lewis v. Humboldt Acquisition Corp., 681 F.3d 312, 317, 321 (6th Cir. 2012) (en banc) (abrogating Monette in part by holding that a plaintiff must show that he or she suffered an adverse employment action "because of" rather than "solely by reason of" disability). A plaintiff may do so "by introducing direct evidence of discrimination, including evidence that the employer relied upon the plaintiff's disability in making its employment decision, or by introducing indirect evidence of discrimination." Monette, 90 F.3d at 1178 (citation omitted). Plaintiff has expressly stated that he only seeks to prove disability discrimination via indirect evidence, (Docket No. 37 at 9), and the Court therefore declines to wade into the direct evidence analysis.

The indirect method of proof employs the burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).[3] To establish a claim for disability discrimination under the indirect method, a plaintiff must first establish a prima facie case of discrimination by showing that "(1) he or she is disabled, (2) he or she is otherwise qualified for

---

[3] In Anderson v. Standard Register Co., 857 S.W.2d 555, 558 (Tenn. 1993), the Tennessee Supreme Court adopted the burden-shifting framework of McDonnell-Douglas. The Tennessee Supreme Court later overruled the Anderson decision, holding instead that the McDonnell-Douglas burden-shifting framework does not apply at the summary judgment stage in Tennessee. See Gossett v. Tractor Supply Co., 320 S.W.3d 777, 785 (Tenn. 2010). The Tennessee General Assembly subsequently enacted Tenn. Code Ann. § 501-801, which superseded the holding in Gossett and reinstated the burden-shifting framework. Thus, like discrimination claims under the ADA, discrimination claims under the TDA are analyzed under McDonnell-Douglas.

7

the position, with or without reasonable accommodation, (3) he or she suffered an adverse employment decision, (4) the employer knew or had reason to know of the plaintiff's disability, and (5) the position remained open while the employer sought other applicants or the disabled individual was replaced." Whitfield, 639 F.3d at 259 (reaffirming that "Monette states the proper test" under the indirect method). Once the plaintiff establishes a prima facie case under the indirect method, the burden shifts to the defendant to "offer a legitimate explanation for its action." Monette, 90 F.3d at 1186. If the defendant does so, the burden then shifts back to the plaintiff, who "must introduce evidence showing that the proffered explanation is pretextual." Id. See also Ferrari v. Ford Motor Co., No. 15-1479, 2016 WL 3443646, at *4 (6th Cir. June 23, 2016) (clarifying the proper framework for analyzing discrimination claims using the indirect method of proof).

### 1. *Plaintiff Has Failed to Establish a Prima Facie Case of Discrimination*

Plaintiff's prima facie case fails first and foremost because he has not shown that he has a disability within the meaning of the ADA. The ADA defines a disability as "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102. The ADA's implementing regulations further define what it means to be disabled: "An impairment is a disability within the meaning of this section if it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population." 29 C.F.R. § 1630.2(j)(1)(ii). Major life activities include "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, sitting, reaching, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, interacting with others, and working." 29 C.F.R. § 1630.2(i)(1)(i).

The evidence of a disability is overwhelmingly scant. Plaintiff has not alleged any limitations on major life activities whatsoever. To the contrary, the record indicates that he performed his job without issue. Plaintiff alleges in the Complaint that he was in a car accident in 2013, which caused a neck injury with long-term effects. (Docket No. 1 at ¶¶ 8, 9). The record also includes an email from April 25, 2014, wherein Plaintiff informs his supervisor that he will need surgery "to repair the 6th vertebrae." (Docket No. 31-6). But when asked to identify his disability during discovery, Plaintiff neither named a specific medical issue nor provided any documentation thereof. He merely responded that he "suffered from a long-term physical impairment, with lasting residual effects that substantially limited some major life activities as a result of injuries sustained in a car accident." (Docket No. 23-1 at 5). Such a statement is inadequate to establish a disability. Plaintiff has failed to name any specific residual effects of his injury and to elaborate on which life activities were limited and how. His vague descriptions of his medical issues do not, without more, rise to the level of a disability. See Neely v. Benchmark Family Servs., No. 15-3550, 2016 WL 364774, at *5 (6th Cir. Jan. 26, 2016) ("We therefore hold that [Plaintiff's] self-described symptoms to his physicians, without corroborating medical evidence or any diagnosis are insufficient to establish a substantial limitation on a major life activity."). Thus, Plaintiff has not demonstrated that he had a disability within the meaning of the ADA or TDA.

Neither has Plaintiff shown that Defendant perceived him as having a disability. "Individuals may be regarded as disabled when (1) [an employer] mistakenly believes that [an employee] has a physical impairment that substantially limits one or more major life activities, or (2) [an employer] mistakenly believes that an actual, nonlimiting impairment substantially limits one or more [of an employee's] major life activities." Ferrari, 2016 WL 3443646, at *5

(citations omitted).  In his Response in Opposition, Plaintiff notes that his supervisors knew that his neck sometimes caused him pain and that his pain level was severe enough to require a second surgery.  (Docket No. 37 at 11).  Plaintiff presents no other evidence that Defendant regarded him as disabled.  Plaintiff does not even say what major life activity Defendant believed was limited by his alleged injury.  To the contrary, has agreed that "he was fully capable of performing his job" and that Defendant in no way limited his "duties or opportunities."  (Docket Nos. 24 & 38 at ¶ 39).  There is no evidence, therefore, that Defendant regarded Plaintiff as disabled.

Plaintiff has failed to establish a prima facie case of discrimination under the ADA because he cannot satisfy the first prong of the analysis by showing that he has a disability.  He never identifies or describes his alleged disability and completely fails to evidence how such a disability limits his activities.  Plaintiff also concedes that Defendant never treated him as disabled.  That failure alone is sufficient to entitle Defendant to summary judgment on Plaintiff's ADA and TDA claims.

### 2. *Plaintiff Cannot Rebut Defendant's Legitimate Reason for His Termination*

The Court also notes that even if Plaintiff had established that a prima facie case of discrimination, his claim would still fail because he cannot overcome Defendant's legitimate reason for his termination.  Defendant maintains that Plaintiff was terminated for his violation of the LOTO policy and Plaintiff presents no evidence that this assertion is pretextual.

To survive a motion for summary judgment, Plaintiff need not definitively prove that Defendant's stated reason for his termination is pretextual, but must prove "enough to create a genuine issue as to whether the rationale is pretextual."  Whitfield, 639 F.3d at 260.  "Under the law of our circuit, a plaintiff can show pretext in three interrelated ways: (1) that the proffered

reasons had no basis in fact, (2) that the proffered reasons did not actually motivate the employer's action, or (3) that they were insufficient to motivate the employer's action." Romans v. Mich. Dep't of Human Servs., 668 F.3d 826, 839 (6th Cir. 2012) (quoting Chen v. Dow Chem. Co., 580 F.3d 394, 400 (6th Cir. 2009)); see also Smith v. Chrysler Corp., 155 F.3d 799, 805-06 (6th Cir. 1998) (reciting same standard in ADA case).

Plaintiff has not disputed any of the facts regarding his LOTO violation. Quite the opposite: he does not dispute Defendant's version of events, wherein he disregarded both the written policy and the instruction of his superiors to stop working and lock out the machine. Plaintiff also did not dispute that similar violations had resulted in terminations other than his own. (Docket Nos. 24 & 38 at ¶ 41). Plaintiff admits that the Company's LOTO policy specifically notes that violations may be punished by termination. (Id. at ¶ 12). Neither has Plaintiff put forth any evidence that his termination is attributable to anything other than his failure to comply with the Company's LOTO policy. He does not dispute the statement that his injury and upcoming surgery "were not discussed during the conference call [that determined his termination], nor were they a factor in the decision to terminate his employment." (Id. at ¶ 35). Instead, Plaintiff seems to stake his claims on the fact that his termination followed so soon after he alerted his supervisor of his need for another surgery. Yet any chain of causation that could feasibly be established by the temporal proximity between his email and his termination is severed by Plaintiff's own intervening action, the LOTO violation.

Thus, Plaintiff has neither established a prima facie case of discrimination nor rebutted Defendant's stated—and well-supported—reason for his termination. His claim of discrimination under the ADA must fail, and with it, his TDA claim.

B. FMLA CLAIM

Plaintiff also alleges that Defendant terminated him in violation of the FMLA. The FMLA entitles eligible employees to take up to twelve weeks of leave during any twelve month period because of a "serious health condition" that renders the employee unable to perform the functions of his job position. 29 U.S.C. § 2612(a)(1)(D). A "serious health condition" includes an illness, injury, impairment, or physical or mental condition that involves either inpatient care in a hospital or continuing treatment by a health care provider. 29 § U.S.C. 2611(11). The Sixth Circuit has recognized two distinct theories of recovery under the FMLA:

> (1) the so-called "entitlement" or "interference" theory, stemming from 29 U.S.C. § 2615(a)(1), which provides that "[i]t shall be unlawful for any employer to interfere with, restrain, or deny the exercise or attempt to exercise, any right provided under [the FMLA]"; and (2) the "retaliation" or "discrimination" theory arising from 29 U.S.C. § 2615(a)(2), which states that "[i]t shall be unlawful for any employer to discharge or in any other manner discriminate against an individual for opposing any practice made unlawful by [the FMLA]."

Daugherty v. Sajar Plastics, Inc., 544 F.3d 696, 707 (6th Cir. 2008) (quoting Edgar v. JAC Prods., Inc., 443 F.3d 501, 508 (6th Cir. 2006)). Plaintiff invokes both theories of FMLA liability and the Court will address each in turn. Again, Plaintiff limits his claim to what can be proven through indirect evidence and so the Court again cabins its analysis to whether Plaintiff's claim survives under the McDonnell-Douglas framework.

*1. Interference with FMLA Leave*

Plaintiff asserts that the Company interfered with his right to FMLA leave by firing him after he notified them of an upcoming surgery that would require him to take leave. To demonstrate inference, a plaintiff must show that "(1) he was an eligible employee, (2) the defendant was an employer as defined under the FMLA, (3) he was entitled to leave under the FMLA, (4) he gave the employer notice of his intention to take leave, and (5) the employer

denied the employee FMLA benefits to which he was entitled." Grace v. USCAR, 521 F.3d 655, 669 (6th Cir. 2008) (citing Edgar, 443 F.3d at 507).  Although there may be material questions of fact going to whether Plaintiff has established a prima facie case of FMLA interference, his claim is ultimately barred because Defendant has supplied a legitimate reason for his termination.  "[I]nterference with an employee's FMLA rights does not constitute a violation if the employer has a legitimate reason unrelated to the exercise of FMLA rights for engaging in the challenged conduct."  Grace, 521 F.3d at 670 (citing Edgar, 443 F.3d at 508 and Arban v. West Publ'g Corp., 345 F.3d 390, 401 (6th Cir. 2003) ("An employee lawfully may be dismissed, preventing him from exercising his statutory rights to FMLA leave or reinstatement, but only if the dismissal would have occurred regardless of the employee's request for or taking of FMLA leave.")).

In an attempt to rebut Defendant's explanation for his termination, the LOTO violation, Plaintiff does not dispute any of the facts but rather argues that his own experience and judgment superseded the Company's safety policies. (Docket No. 37 at 20).  Plaintiff apparently believes that because he felt his conduct in making the adjustments without locking out the machine did not pose a safety risk, his LOTO violation was not the real reason for his violation.  The facts on the record indicate otherwise.  As discussed above, Plaintiff does not dispute that under IAC's LOTO policy, his infraction was serious enough to result in termination.  He also agrees that others faced the same disciplinary measure for similar violations.  He does not, however, present any evidence that the Company generally allows employees to substitute their own safety judgment in place of the written policies yet declined to do so in Plaintiff's case because of his notice of leave.  Thus, Plaintiff again fails to rebut Defendant's justification as pretextual and his claim for FMLA interference fails.

### 2. Retaliation for Requesting FMLA Leave

Plaintiff also argues that the proximity of his termination to his April 25th email disclosing his need for spinal surgery cements his prima facie case of FMLA retaliation. To establish a prima facie case of FMLA retaliation under the indirect method, a plaintiff must show that (1) he or she engaged in an activity protected by the FMLA; (2) the employer knew that he or she was exercising FMLA rights; (3) he or she suffered an adverse employment action; and (4) there was a causal connection between the protected FMLA activity and the adverse employment action. Seeger v. Cincinnati Bell Tel. Co., LLC, 681 F.3d 274, 283 (6th Cir. 2012). Once a plaintiff has established a prima facie case of FMLA retaliation, the analysis follows the familiar McDonnell Douglas burden-shifting framework. Id.

Plaintiff makes much of the timing of events, namely, the proximity between his April 25th email and his April 28th termination. He contends that the Sixth Circuit has held that "nearness in time can meet the low threshold of proof necessary to establish a prima facie case of retaliatory discharge." (Docket No. 37 at 18) (citing Seeger v. Cincinnati Bell Tel. Co., LLC, 681 F.3d 274, 283 (6th Cir. 2012)). While that may be true, Plaintiff's claim for FMLA retaliation suffers from the same fatal flaw as his disability discrimination and interference claims: regardless of whether he has established a prima facie claim of retaliation, Plaintiff cannot overcome Defendant's stated reason for his termination. The facts on the record, which Plaintiff does not dispute, tell a story in which a serious safety violation happened to coincide with an employee's vague notification to his employer about an upcoming medical procedure. In some cases, this timing would indeed indicate a thinly-veiled excuse for retaliatory termination. This is not one of those cases; the record unequivocally confirms that Plaintiff committed a terminable offense.

## V. Conclusion

The evidence on the record shows that Defendant terminated Plaintiff for one reason and one reason only: his violation of the Company's LOTO policy. Even if Plaintiff could establish a prima facie case of disability discrimination, FMLA interference, or FMLA retaliation, he falls woefully short of the mark when it comes to showing that Defendant's stated reason for his termination is pretext. Accordingly, Defendant is entitled to summary judgment on all claims.

A separate order shall enter.

_____
KEVIN H. SHARP
UNITED STATES DISTRICT JUDGE